Juli Farris (Bar No. 141716)
jfarris@kellerrohrback.com
Matthew J. Preusch (Bar No. 298144)
mpreusch@kellerrohrback.com
KELLER ROHRBACK L.L.P.
1129 State Street, Suite 8
Santa Barbara, CA 93101
(805) 456-1496, Fax (805) 456-1497

Robert Lawrence Lieff (No. 037568)
rlieff@lchb.com
Robert Nelson (No. 132797)
rnelson@lchb.com
Elizabeth J. Cabraser (No. 83151)
ecabraser@lchb.com
Lieff Cabraser Heimann & Bernstein, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111
(415) 956-1000, Fax (415) 956-1000

***Attorneys for Plaintiffs***
***(Additional Counsel on Signature Page)***

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| KEITH ANDREWS, TIFFANI ANDREWS, SARAH RATHBONE, JOSH CHANCER, JOSEPH VIENS, CORT PIERSON, and WEIHAI ZHEUNG individually and on behalf of others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>PLAINS ALL AMERICAN PIPELINE, L.P., a Delaware limited partnership, PLAINS PIPELINE, L.P., a Texas limited partnership, and JOHN DOES 1 through 10,<br><br>Defendants. | Case No.<br><br>**COMPLAINT – CLASS ACTION**<br><br>**DEMAND FOR JURY TRIAL** |

## I.    INTRODUCTION

Plaintiffs Keith Andrews, Tiffani Andrews, Sarah Rathbone, Josh Chancer, Joseph Viens, Cort Pierson, and Weihai Zhueng (collectively "Plaintiffs"), individually and on behalf of all others similarly situated, allege the following against Plains All American Pipeline, L.P., Plains Pipeline, L.P., and John Does 1 through 10 ("Defendants" or "Plains"), based where applicable on personal knowledge, information and belief, and the investigation and research of counsel.

## II.    NATURE OF THE ACTION

1.      On the morning of May 19, 2015, a 10-mile long, 24-inch wide oil pipeline in Santa Barbara, California known as Line 901 and owned and operated by Defendants ruptured. For Defendants' Texas-based companies, ruptured pipelines are nothing new; since 2006, federal agencies have cited them for at least 175 safety and maintenance violations. What makes this failure different, however, is that this pipeline runs along the edge of the Pacific Ocean, and the rupture sent thousands of gallons of toxic crude oil flowing over some of the most beautiful beaches and pristine waters in California.

2.      Before Defendants managed to shut-off Line 901, it had discharged over 100,000 gallons of lobstecrude oil. Oil coated the shoreline, clinging to rocks, sand, and the animals it touched. Oil floated out to sea, creating a slick that stretched for miles, contaminating several State Marine Conservation Areas along the way, and forcing the closure of beaches, fishing grounds, and shellfish operations.

3.      These waters are home to hundreds of sensitive animal species, and serve as the backbone of the local economy. Tourists come to these beaches to enjoy the unspoiled sand and water. People support themselves and their families by harvesting fish and shellfish from these waters. All that has been damaged by this spill, and that damage will likely last for decades.

4.    This depressingly familiar story could have been averted had Defendants installed an automatic shut-off valve on the pipeline. Such systems are not new or novel; they are ubiquitous on pipelines across the country. In fact, Line 901 is the only pipeline of its kind in Santa Barbara County without this key safety feature.

5.    The absence of an automatic shut-off system is no accident. When Defendants, through their predecessor in interest, built the pipeline in 1987, Santa Barbara County demanded that it install such a shut-off system and allow the County to inspect the welds on the pipeline. Rather than doing the responsible thing and installing safety systems and protocols, as all the other pipeline owners in the area did, Defendants sued, arguing that the County lacked the authority to force it to install an automatic shut-off system or inspect its pipeline. As a result, Line 901 has no automatic shut-off system, and now more than 100,000 gallons of crude oil pollutes the waters and beaches on which the people and wildlife of this region depend.

6.    Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23 on their own behalves and as representatives of others similarly situated to recover significant economic losses they have incurred and will continue to incur because of Defendants' oil spill.

### III.    PARTIES

7.    Plaintiffs Keith and Tiffani Andrews are residents of San Luis Obispo County, California.

8.    Plaintiff Sarah Rathbone is a resident of Santa Barbara County, California.

9.    Plaintiff Josh Chancer is a resident of Ventura County, California.

10.    Plaintiff Joseph Viens is a resident of Santa Barbara County, California.

11.     Plaintiff Cort Pierson is a resident of Santa Barbara County, California.

12.     Plaintiff Weihai Zhueng is a resident of Los Angeles County, California.

13.     Defendant Plains All American Pipeline, L.P. is a Delaware limited partnership with its principal place of business in Houston, Texas. Defendant operates through or on behalf of PAA GP LLC, a Delaware limited liability company; Plains AAP, L.P. ("AAP"), a Delaware limited partnership that is the sole member of PAA GP LLC; Plains All American GP LLC ("GP LLC"), a Delaware limited liability company; Plains GP Holdings, L.P. ("PAGP"), a Delaware limited partnership that is the sole member of GP LLC; and PAA GP Holdings LLC, the general partner of PAGP.

14.     Defendant Plains Pipeline, L.P. is a Texas limited partnership with its principal place of business in Houston, Texas. Plains Pipeline, L.P. is a subsidiary of Plains All American Pipeline, L.P.

15.     On information and belief Defendants John Does 1 through 10, are corporations or partnerships, the names and addresses of residence of which are currently unknown.

16.     Defendants own and operate the All American pipeline system, a common carrier crude oil pipeline system that transports crude oil produced from two outer continental shelf fields off the California coast via connecting pipelines to refinery markets in California. The system receives crude oil from ExxonMobil's Santa Ynez field at Las Flores and receives crude oil from the Freeport-McMoRan-operated Point Arguello field at Gaviota.

## IV.    JURISDICTION AND VENUE

17.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because the amount in controversy exceeds $5 million, exclusive of

interest and costs, and members of the proposed class are citizens of different states than Defendants.

18.     This Court has personal jurisdiction over Defendants because they are registered to conduct business in California, and have sufficient minimum contacts with California.

19.     Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District, and because Defendants discharged oil onto the beaches of and conduct business in Los Angeles County.

## V.     FACTS

### A.     The Gaviota Coast

20.     The Gaviota Coast, north of Santa Barbara, is a special place. Its blue waters and beautiful coastline are home to an abundance of life, including critical populations of endangered Snowy Plovers, seals, migrating whales, and myriad fish. For those reasons, the area is often called North America's Galapagos.

21.     Because of its natural bounty and beauty, as long as people have lived in North America, they have lived on the Gaviota Coast. Today, the economic life in this region revolves around its waters and beaches. Thousands of people in Santa Barbara County depend on the ocean and beaches for their jobs – fishing, tourism, and recreation in the region rely on them.

22.     For example, a 2014 report by the Commercial Fishermen of Santa Barbara found that, between 1980 and 2013, local fishermen generated over $328 million in earnings at the dock, or ex-vessel value. That amounts to average annual earnings of $11 million.

23.     Santa Barbara's port has the highest earnings in the state for red sea urchin, California spiny lobster, red rock crab, yellow rock crab, giant red sea cucumber, white seabass, and grass rockfish.

24.     Now contamination by Defendants' oil spill has undermined the health of the environment on which that economy depends.

25.     Threats to the Gaviota Coast and Santa Barbara's environment and economy from oil development are not new. In 1969, a blowout at Union Oil's off-shore drill rig sent millions of gallons of oil into the waters and onto the beaches of Santa Barbara County. The blowout killed thousands of birds, dolphins, fish, and other marine life.

26.     Despite that disaster, the oil industry has only continued to grow in and around Santa Barbara County. Today, however, governments and some companies have taken significant steps to make the production and transportation of crude oil safer and more reliable. Defendants, on the other hand, are notable for their track record of doing otherwise.

**B.     The Failure of Defendants' Line 901**

27.     Line 901, a 10-mile long, 24-inch wide pipeline owned and operated by Defendants, runs along the edge of the Pacific Ocean, transporting up to 6,300,000 gallons of oil a day between Gaviota and Las Flores. The route takes the pipeline past several state parks and beaches, including Refugio State Beach, carrying crude from offshore platforms inland, and from there to refineries.

28.     On the morning of May 19, 2015, Line 901 ruptured near Refugio State Beach, spilling toxic oil onto the beach and into the Ocean.

29.     As oil poured out of the ruptured pipe, neighbors and beachgoers became overwhelmed by the smell of oil. At approximately 11:30 a.m. the Santa Barbara County Fire Department responded to reports of the odors, and arrived to find oil flowing from the pipeline, through a storm drain under Highway 101, across the beach, and into the Pacific Ocean. Oil continued to leak from the pipeline until approximately 3 p.m.

30.     Initially, the oil covered the beach and rocks just below the failed pipe. But once it reached the water, the oil spread quickly, travelling for miles out to sea. The oil fouled beaches for miles in each direction. As of May 28, 2015, the spill impacted up to 28 miles of coastline.

31.     While the precise timeline of events is still not known, it appears that Defendants did not promptly act to respond to signs of the pipeline's failure or notify relevant government agencies. As California's two United States senators stated in a letter to Defendants, "we are concerned that Plains Pipeline may not have detected this spill or reported it to federal officials as quickly as possible, and that these delays could have exacerbated the extent of the damage to the environment." The senators called Defendants' response "insufficient."

32.     Indeed, as reported by the *Los Angeles Times*, it appears that "chaos and delay marked the initial hours after [the] pipeline burst." According to Defendants' response to the senators' letter, Plains personnel were unable to timely notify federal spill response officials or communicate with other Plains representatives due to in part "distractions" at the spill site. Defendants' on-site employee was reduced to using a shovel to try to build a berm to contain the spill. It was several hours before Defendants notified federal spill response officials, even though Defendants' representatives were conducting a spill response drill nearby *that very morning*.

33.     Witnesses who visited Refugio State Beach that night of the spill reported little or no response. Even the next day, as professional clean-up crews began responding to Refugio State Beach, the response efforts at other nearby beaches were left to volunteers with little or no training or protective equipment, using nothing but shovels and five-gallon buckets in attempts to remove thousands of gallons of crude from the sand and sea.

34.    Despite the efforts of those volunteers and professional responders, the spill has already impacted numerous Marine Protected Areas that provide vital breeding and feeding grounds for marine species, as shown in this map prepared by the GreenInfo Network:



35.    As the oil spread, so did its terrible consequences. Hundreds of fish, birds, and marine mammals have died after being covered in oil or exposed to the oil's toxic compounds. Tar balls from Defendants' spill fouled beaches far to the south and east of Refugio, including beaches in Ventura and Los Angeles counties. Frisbee-sized "oil pancakes" drifted into the waters of Channel Islands National Park. An oil-covered duck appeared at Alice Keck Park in downtown Santa Barbara, trying to clean itself in a decorative pond.

36.    Those are the visible harms, relatively easy to see and tally. Beneath the ocean's surface, however, a largely unseen catastrophe is unfolding. There, as the oil sinks and swirls in the tides and currents, it is likely suffocating sea grass,

clinging to kelp beds, smothering reefs, and otherwise seeping into the aquatic
food chain through shellfish and plankton. Dead bass, lobsters, crabs, octopi and
other species that live beneath the surface offshore are already washing up on area
beaches.

37. In Santa Barbara, those environmental impacts translate to profound
economic impacts. In the short term, the oil from Defendants' ruptured pipeline
closed fishing grounds and shellfish areas, and caused many canceled reservations
from tourists who otherwise would be spending their money on hotels, restaurants,
kayaking or surf trips, and fishing charters.

38. For example, state officials closed these key coastal fishing areas from
Canada de Alegeria to Coal Oil Point, including the shoreline and offshore areas
between those points to 6 miles offshore. Even though that closure was recently
lifted, the spill's impacts on those fisheries will continue far into the future. Also,
the negative publicity from the spill has and will continue to deter seafood buyers
from seeking out Santa Barbara seafood.

39. The spill has also discouraged tourists from visiting businesses in
Santa Barbara County, where tourism (along with agriculture and wine) accounts
for roughly 15 percent of the workforce, or over 36,000 jobs. For example, one
local kayaking company reported 25 cancellations following the spill, resulting in a
loss of approximately $3,000. Two popular state beaches—Refugio and El
Capitan—were closed during one of the busiest holiday weekends of the year.

On May 19, 2015, a privately owned crude oil pipeline ruptured, causing an oil spill within and around
Refugio State Beach. State beaches affected by this incident include Refugio and El Capitan near Goleta.

**Both beaches are closed until further notice.**

Camping reservations have been cancelled through July 9th, 2015 in an effort to expedite clean-up
efforts. Campers with reservation during this time will be provided a full refund through Reserve America.

Visitors wanting to find alternative overnight camping opportunities should contact a Reserve America
representative at 1-800-444-7275 to locate campgrounds nearby.

For current beach areas open for day use during the holiday weekend in Santa Barbara and Ventura
counties, visitors should call (805) 585-1850. This site will be updated with information when made
available. We apologize for any inconvenience.

http://www.parks.ca.gov/?page_id=603

As of today, Refugio will remain closed through July 9, 2015.

40.    Finally, the oil spill presents a serious risk to human life. The Santa Barbara County Health Department recommended that residents avoid all areas affected by the spill, but a major highway runs through and adjacent to the spill area. The County called Refugio Beach a "Hazmat area." The County also warned that direct contact with oil, inhalation of fumes, or ingestion of contaminated fish or shellfish can cause skin irritation, nausea, vomiting, and other illnesses.

41.    Following the spill, the group Water Defense collected oil and water samples to test for chemicals that could be harmful to the public. Those tests confirmed several toxic chemicals known to pose severe threats to human health and marine life were present in Defendants' oil spill, including Ethylbenzene, Toluene, Xylene, and Naphthalene. Those test results also confirmed the presence of Glutaraldehyde, a biocide used in drilling, fracking, and acidizing injections. Defendants released those chemicals onto the beach and into the Pacific Ocean, contaminating ocean waters and threating human and marine life.

42.    Long term, the impacts may be as-yet-unknown, but they are no less certain. Even with the best spill response, toxic oil will remain in the environment for a long time, continuing to harm water, wildlife, and beaches. Recently, five years after the Deepwater Horizon oil spill in the Gulf of Mexico, officials assessing the damage to that ecosystem said "the environmental effects of this spill is likely to last for generations." So too with this spill, which will cause similarly long-lasting environmental and economic impacts.

C.    **Plains Has a Long History of Recklessly Avoiding Installing Safety Equipment**

43.    While this spill is a disaster, it is not an accident. Defendants wantonly disregarded the health and safety of the people and environment by operating a pipeline it knew did not have proper safety systems in place.

44.     In 1987, when Defendants constructed Line 901, Santa Barbara County's Energy Division sought to ensure the pipeline was constructed properly by, among other things, inspecting the welds on the pipeline using X-rays. The Division routinely inspected welds on new pipelines, as a way to ensure they had been done correctly to reduce the risk of failure. The Division also ordered Defendants to install an automatic shut-off valve system on the pipeline to ensure the pipeline would shut down swiftly, and without having to wait for human action, at the first sign of a problem in the pipeline.

45.     Rather than agreeing to these commonplace and common-sense safety protocols, Defendants instead fought the County, suing it in U.S. District Court in 1987 and arguing it lacked jurisdiction to regulate its pipeline design and installation.

46.     As a result, today Line 901 is the only pipeline in Santa Barbara County "whereby the county is preempted from monitoring and safety inspections," said Kevin Drude, Director of the County's Energy Division. Drude has publicly said that Defendants' employees rarely, if ever, attend monthly meetings that he holds to discuss safety concerns with all the pipeline operators under his jurisdiction.

47.     Also as a result of its lawsuit against the County, today Defendants operate the only pipeline of its type in the County without an automatic shut-off valve system. For those reasons, it is the only pipeline that is capable of failing and discharging more than 100,000 of gallons of oil.

48.     According to federal regulators, Line 901 was also severely corroded prior to the spill. Preliminary findings by the Pipeline and Hazardous Materials Safety Administration show that an early May 2015 inspection of Line 901 revealed "extensive external corrosion," including pipeline walls reduced by 54 to 74 percent of its original thickness. The pipeline had been reduced to 1/16 of an

inch at the area of the pipeline failure, the agency said. Defendants had apparently repaired corrosion at three adjacent parts of Line 901 in recent years, suggesting it was aware of extent of the corrosion on the line. On June 3, the agency found that continued operation of Line 901 and a larger pipeline it connects to—Line 903—"would be hazardous to life, property, or the environment."

49.    While Santa Barbara, its citizens, and environment bore the risk, and now reality, of a catastrophic pipeline failure, Defendants have reaped rising profits, reported at roughly $878 million on over $43 billion in earnings in 2014. By avoiding the cost of safety equipment and systems, Defendants boosted their profits by transferring the cost of failure to people who live and work in Santa Barbara County.

50.    The lax safety standards at Line 901 are not isolated incidents for Defendants. Since 2006 Plains has been cited for over 175 violations of safety requirements, causing nearly $24 million in property damage. Eleven of those incidents were in California. Plains is one of the top four most-cited pipeline operators in the country.

51.    Even more alarming is that, according to federal statistics analyzed by the website The Smart Pig Blog, the "number of incidents on crude oil pipelines operated by [Plains] . . . is increasing faster than the national average," as shown in this chart:



52.     Last year, for example, a pipeline owned and operated by Defendants ruptured in a Los Angeles neighborhood, covering the streets, cars, houses, and businesses in oil. The cause: a poorly maintained pipeline. A few years ago, another poorly maintained Plains pipeline ruptured and sent oil into a drinking water reservoir for Los Angeles.

53.     In 2010, pursuant to a Consent Decree filed by the U.S. EPA following numerous alleged violations of the Clean Water Act by Defendants in several states, Defendants represented that it would update its procedures such that the "[i]f there is an unexplained increase in delivery flow-rate with corresponding decrease in pressure – [Plains would] SHUTDOWN the affected line segment."

54.     As part of that settlement, Defendants paid a $3.25 million penalty for 10 spills between June 2004 and September 2007 that discharged a total of roughly 273,420 gallons of crude oil into navigable waters or adjoining shorelines in Texas, Louisiana, Oklahoma, and Kansas.

55.     Plains itself recently acknowledged in a disclosure report to the U.S. Securities and Exchange Commission that it has "experienced (*and likely will experience future*) releases of hydrocarbon products into the environment from our pipeline . . . operations" that "may reach surface water bodies." (Emphasis added).

56.     In short, Plains has an ugly tradition of operating pipelines that fail. The communities through which it transports oil suffer the consequences.

57.     Local fishermen, on the other hand, pride themselves on their environmental stewardship and must comply with a maze of state and federal regulations. For example, fishermen must follow seasonal closures, take limits, gear restrictions, and strict reporting requirements.

58.     Defendants, meanwhile, profited and continue to profit from its failure to comply with local, state, and federal requirements and guidelines, and its decision not to repair and/or replace Line 901.

59.     Defendants knew of the extremely high risk of catastrophic injury inherent in the transportation of oil through a pipeline. Notwithstanding, Defendants took no action to prevent or protect Plaintiffs and the Class. Indeed, Defendants actively avoided taking action to protect Plaintiffs and the Class from apparent risks its Line 901 pipeline presented. Defendants demonstrated a callous and reckless disregard for human life, health, and safety by operating Line 901 without proper safety equipment. This disregard for human life and safety at Line 901 is part of a pattern and practice that Defendants have demonstrated across the country. Defendants acted with such indifference to the consequences of its misconduct, with such recklessness, and as part of a well-established pattern, as to be willful, malicious, and oppressive, and in disregard of the rights of the Plaintiffs, thereby meriting an award of punitive or exemplary damages against Defendants.

60.     This lawsuit therefore seeks to compensate the victims of the spill and to ensure that Defendants are prevented from causing additional damage to Santa Barbara County's economy and environment in the future.

## VI.    PLAINTIFFS' FACTS

**A.     Plaintiffs Keith and Tiffani Andrews**

61.     Keith and Tiffani Andrews, husband and wife, are residents of Santa Margarita, California. They have been fishing together for more than a decade.

62.     Their boat, F/V Alamo, is a 1945 Monterey Trawler, built in Monterey, California, that sails from the Santa Barbara Harbor, as pictured below.



63.     Although Keith and Tiffani Andrews fish for a variety of species, their primary source of income is trawling for sea cucumbers in the waters off of Refugio State Beach.

64.     Sea cucumbers are echinoderms, which puts them in the same genus as star fish. The Andrews primarily catch the California sea cucumber, *Parastichopus californicus*, also known as the giant red sea cucumber. Sea cucumbers, particularly those from Santa Barbara, are highly sought after in many Asian markets. Nearly the entire catch of Santa Barbara sea cucumbers is processed in California and then shipped to China, where they are sold at handsome prices.

65.     Although sea cucumbers grow in waters around the world, people pay a premium for Santa Barbara sea cucumbers. Indeed, sea cucumbers from Santa

Barbara County are among the top three most expensive varieties, and often individually packaged in wooden boxes for sale in specialty stores in China.

66.    Defendants' oil spill could not have happened at a worse location.

67.    The Andrews fish for sea cucumbers almost exclusively in the waters that were closed because of the oil spill. That now tainted area is the best habitat for sea cucumbers. Other than a small strip of sea just east of the formerly closed area, there are virtually no other places where the Andrews can fish for Santa Barbara sea cucumbers.

68.    And, Defendants' oil spill could not have come at a worse time.

69.    Sea cucumber season opened on June 16, 2015. That day, the Andrews should have been sailing into the waters off of Refugio, lowering their net overboard, to catch the sea cucumbers they sell to make a living. Instead, those waters were closed. The Andrews have been forced to confine their trawls to a narrow strip of water just east of the closed area.

70.    Defendants' oil spill is already having a profound effect on the Andrews and their ability to do their jobs.

71.    Not only were critical fishing grounds closed, the Andrews are worried that the market for Santa Barbara sea cucumbers may forever be harmed. Foreign and domestic consumers are willing to pay top dollar for Santa Barbara sea cucumbers because of Santa Barbara's reputation of having pristine waters. As the image of clean blue waters in California is tarnished by images of oil coating beaches, dolphins, and birds, there is a significant, concrete risk that buyers may shy away from purchasing sea cucumbers caught there. In fact, potential buyers are already making inquiries about the quality and safety of sea cucumbers caught in Santa Barbara.

72.    As a result, even though the fishing grounds are open and the visible oil may be cleaned up, the Andrews face serious and potentially long-lasting harms

because of Defendants' oil spill.

73.    Defendants' acts and omissions have therefore caused present injury to Keith and Tiffani Andrews, as well as the concrete risk of imminent, serious, and additional injury.

**B.    Plaintiff Sarah Rathbone**

74.    Sarah Rathbone, a resident of Goleta, is the owner and sole member of Community Seafood LLC. Community Seafood is a "boat to table" business: it buys fresh fish from local fishermen and delivers it directly to consumers, who purchase weekly or bi-weekly "shares." A half-pound share is $11 per week; $21 per week buys a pound share.

75.    Community Seafood's shares can include a wide variety of local species: black cod, ridgeback shrimp, yellowtail, yellowfin, albacore, squid, anchovies, oysters, mussels, rockfish, and so on. The three-year old business has nine part-time employees and one-full time employee besides Ms. Rathbone.

76.    Defendants' oil spill has damaged Community Seafood's business. The week following that spill, Ms. Rathbone did not deliver any shares to her customers due to concerns over oil contamination. Those roughly 350 cancelled shares led to lost revenue of over $6,500 for Community Seafood and Ms. Rathbone.

77.    Since then, as local fish have become scarcer, Ms. Rathbone has had to spend time and money to drive to out-of-town to places like Morro Bay to purchase more expensive species, like salmon, to fulfill her orders. Those increased costs have largely erased her profits on her weekly shares, which have fixed prices.

78.    Ms. Rathbone believes the negative consequences of Defendants' oil spill will continue to impact the Santa Barbara fishery, and consequently her business, for years to come. Defendants' acts and omissions have therefore caused

present injury to Ms. Rathbone, as well as the concrete risk of imminent, additional injury.

**C.    Plaintiff Josh Chancer**

79.    Josh Chancer is a resident of Oxnard, California, where he is a history teacher at Pacifica High School.

80.    In order to augment his public school salary, Mr. Chancer is a commercial fisherman during the summer months.

81.    Each summer for the past four years, Mr. Chancer has gone fishing in the waters off the Gaviota Coast, where fishes for a variety of species, including halibut, yellowtail jack, and sea bass.

82.    The income he derives from this fishing is significant.

83.    Defendants' oil spill, however, has seriously affected Mr. Chancer's ability to fish. Nearly all of Mr. Chancer's landings are from the precise area closed as a result of Defendants' oil spill.

84.    For Mr. Chancer, the timing and location of Defendants' oil spill could not have been worse. The spill happened in precisely the waters he routinely fishes at precisely the time he routinely fishes.

85.    The spill and resulting fishing closure has already affected Mr. Chancer's annual income, as he has been unable to fish.

86.    Not only did Mr. Chancer lose the ability to fish in the closed fishing grounds, he is concerned that the spill will have long-lasting repercussions for his ability to derive income from catching and selling fish. Defendants' oil spill may have seriously and permanently harmed fish populations in the region, seriously reducing Mr. Chancer's ability to catch fish. And, Defendants' oil spill may permanently decrease the market for and the price of the fish Mr. Chancer does catch.

87.    Mr. Chancer believes the negative consequences of Defendants' oil spill will continue to impact the Santa Barbara fishery, and consequently his business, for years to come. Defendants' acts and omissions have therefore caused present injury to Mr. Chancer, as well as the concrete risk of imminent, additional injury.

**D.    Plaintiff Joseph Viens**

88.    Joseph Viens is a resident of Carpenteria, in Santa Barbara County.

89.    Mr. Viens owns several ATMs at state parks and beaches along the Gaviota Coast. He makes money from these ATMs by charging people a small service fee to withdraw cash.

90.    When the parks and beaches are open, the ATMs generate a significant amount of revenue each month, because the services at the parks and beaches– including concession stands—do not accept credit cards, and the nearest banks are miles away. As a result, many people who visit or camp at the parks and beaches use Mr. Viens's ATMs.

91.    When Defendants spilled oil from their pipeline at Refugio State Beach, Mr. Viens's business ground to a halt.

92.    Not only did Defendants' oil foul Refugio Beach, once it hit the water, the oil spread across beaches up and down the coast.

93.    Ultimately Defendants' oil spill forced the closure of two beaches at which Mr. Viens has ATMs.

94.    As no one was allowed to enter or visit the beaches during the closures, Mr. Viens can make no money at all from his ATMs. Even he was prohibited from visiting the ATMs to ensure they were safe.

95.    Not only has Mr. Viens lost money during the beach closures, Mr. Viens is concerned that the oil spill may affect the long-term viability of tourism at

the beaches and parks. If people see images of the oil-covered beaches, they may decide to go elsewhere to camp and recreate. If fewer people visit the beaches and parks at which Mr. Viens maintains ATMs, his ability to earn money will decrease.

96.    Mr. Viens believes the negative consequences of Defendants' oil spill has and will continue to affect his business for years to come. Defendants' acts and omissions have therefore caused present injury to Mr. Viens, as well as the concrete risk of imminent, additional injury.

**E.    Plaintiff Cort Pierson**

97.    Cort Pierson grew up in and remains a resident of Santa Barbara, California.

98.    While Mr. Pierson does not own his own boat, he works on a variety of fishing boats that sail from Santa Barbara.

99.    Recently, Mr. Pierson has worked on a boat that fishes for sea urchin.

100.    Mr. Pierson gets paid a set percentage of the catch—15 percent—at the end of the day; so Mr. Pierson has a direct stake in the success of the sea urchin fishery.

101.    For years, the sea urchin fishery in Santa Barbara has been thriving, and as a result, Mr. Pierson has done well.

102.    Defendants' oil spill, however, threatens the sea urchin fishery and Mr. Pierson's livelihood.

103.    Defendants' oil spill closed one of the most productive sea urchin fishing grounds in the entire region, and the area in which, but for the oil spill, Mr. Pierson would have been fishing for weeks.

104.    As a result of Defendants' oil spill and the resulting fishing ground closure, Mr. Pierson is losing significant economic opportunities to earn his income.

105.   Not only were the fishing grounds closed, but Mr. Pierson is concerned that Defendants' oil spill may have done long-lasting harm to the sea urchin market.

106.   Santa Barbara sea urchins are prized; restaurants around the world advertise "Santa Barbara sea urchins" as centerpieces of their menus. The urchins are prized both for their taste and because Santa Barbara is renowned for its clean waters.

107.   As the image of clean blue waters in California is tarnished by pictures and videos of oil coating beaches, dolphins, and birds, there is a significant, concrete risk buyers may shy away from purchasing sea urchins caught here. In fact, potential buyers are already asking urchin divers like Mr. Pierson about the quality and safety of sea urchins caught there.

108.   As a result, even if the oil is actually cleaned up, Mr. Pierson faces serious and potentially long-lasting harms because of Defendants' oil spill.

109.   Mr. Pierson believes the negative consequences of Defendants' oil spill will continue to impact the Santa Barbara sea urchin fishery, and consequently his business, for years to come. Defendants' acts and omissions have therefore caused present injury to Mr. Pierson, and poses the concrete risk of imminent, additional injury.

**F.    Plaintiff Weihai Zhueng**

110.   Weihai Zhueng is a resident of Los Angeles County, California.

111.   For the past five years Mr. Zhueng has run a business buying, processing, and exporting sea cucumbers from Santa Barbara.

112.   Mr. Zhueng purchases sea cucumbers every day from several different fishing boats during the sea cucumber season in Santa Barbara.

113.   As a result of Defendants' oil spill and the resulting fishing grounds closure, Mr. Zhueng has found there are fewer sea cucumbers for him to buy.

114.   Mr. Zhueng chose to start his business here because sea cucumbers from Santa Barbara are highly sought after, and command a premium price in the international market.

115.   The premium price buyers are willing to pay for Santa Barbara sea cucumbers comes, at least in part, from the fact that Santa Barbara and the waters in the region have the reputation of being clean, healthful, and free from pollution.

116.   As the image of clean blue waters in California is tarnished by pictures and videos of oil coating beaches, dolphins, and birds, there is a significant, concrete risk buyers may shy away from purchasing sea cucumber caught here. In fact, Mr. Zhueng's past buyers and potential buyers are already asking Mr. Zhueng about the quality and safety of sea cucumbers caught here.

117.   As a result, even though the fishing grounds are opened, Mr. Zhueng faces serious and potentially long-lasting harms because of Defendants' oil spill.

118.   Mr. Zhueng believes the negative consequences of Defendants' oil spill will continue to impact the Santa Barbara fishery, and consequently his business, for years to come.  Defendants' acts and omissions have therefore caused present injury to Mr. Zhueng, as well as the concrete risk of imminent, additional injury.

## VII.   CLASS ACTION ALLEGATIONS

119.   Plaintiffs bring claims pursuant to Federal Rule of Civil Procedure 23 on behalf of the Class of similarly situated persons. Plaintiffs propose to represent the following Class:

> All persons or businesses in the United States that claim economic losses, or damages to their occupations,

businesses, and/or property as a result of Defendants'
May 19, 2015 oil spill from Line 901.

120.   The Class members are ascertainable and have a well-defined
community of interest among their members.

121.   **Ascertainability**: Although the Class is large, the precise number of
members can be ascertained in at least two ways. First, because the members of the
proposed Class live in a geographically confined area, providing notice to them via
newspapers, trade publications, and other routine avenues of communication will
be easily accomplished. Second, Defendants' records – such as logs of complaints
from affected Class members – will also serve to ascertain potential Class
members.

122.   **Numerosity**: The members of the Class are so numerous that joinder
of all members would be impractical. The proposed Class likely contains hundreds
of members.

123.   **Commonality**: There are common questions of law and fact that
predominate over any questions affecting only individual members of the Class.

124.   For Plaintiffs and the Class, the common legal and factual questions
include, but are not limited to, the following:

a)      Whether Defendants acted negligently, recklessly, wantonly,
and/or unlawfully to cause the spill;

b)      Whether Defendants had installed and maintained adequate
safety measures and systems on Line 901 and in its systems of command and
control to prevent the spill;

c)      Whether Defendants conducted adequate supervision that could
have prevented the spill or reduced its scale;

d)      Whether Defendants engaged in unconscionable, deceptive,
and/or unreasonable business practices and conduct;

e)      Whether Defendants knowingly, intentionally, or negligently concealed, suppressed, or omitted material facts concerning the safety of its pipeline from the public;

f)      Whether Defendants knowingly, intentionally, or negligently concealed, suppressed, omitted, or delayed relaying material facts regarding the spill to local, state, and federal agencies, thereby slowing the response, and/or increasing the damages to Plaintiffs and members of the Class;

g)      Whether the Class suffered injury by virtue of Defendants' negligence, recklessness, carelessness, and/or unconscionable and/or deceptive business practices; and

h)      Whether Defendants are strictly liable to Plaintiffs and the Class, by virtue of state and/or federal law.

125.    **Typicality**: The representative Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs and all the members of the Class have been injured by the same wrongful acts and omissions of Defendants. Plaintiffs' claims arise from the same practices and course of conduct that give rise to the claims of the members of the Class and are based on the same legal theories.

126.    **Adequacy of Representation**: Plaintiffs are representatives who will fully and adequately assert and protect the interests of the Class, and have retained class counsel who are experienced and qualified in prosecuting class actions. Neither Plaintiffs nor their attorneys have any interests contrary to or in conflict with the Class.

127.    **Rule 23(b)(3)**: In addition to satisfying the prerequisites of Rule 23(a), Plaintiffs satisfy the requirements for maintaining a class action under Rule 23(b)(3). Common questions of law and fact predominate over any questions affecting only individual Class members and a class action is superior to individual litigation. The amount of damages available to individual plaintiffs are insufficient

to make litigation addressing Defendants' conduct economically feasible in the absence of the class action procedure. Individualized litigation also presents a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system presented by the legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

128.    **Rule 23(b)(2)**. Plaintiffs also satisfy the requirements for maintaining a class action under Rule 23(b)(2). Defendants have acted or refused to act on grounds that apply generally to the proposed class, making final declaratory or injunctive relief appropriate with respect to the proposed Class as a whole.

129.    **Rule 23(c)(4)**. Plaintiffs also satisfy the requirements for maintaining a class action under Rule 23(c)(4). The claims of Class members are composed of particular issues that are common to all Class members and capable of class wide resolution that will significantly advance the litigation.

## VIII.  CAUSES OF ACTION

### First Claim for Relief
### Strict Liability under Lempert-Keene-Seastrand Oil Spill Prevention and Response Act, Government Code Section 8670, *et seq*.

130.    Plaintiffs incorporate by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.

131.    The Lempert-Keene-Seastrand Oil Spill Prevention and Response Act provides that "[a]ny responsible party, as defined in Section 8670.3, shall be absolutely liable without regard to fault for any damages incurred by any injured party which arise out of, or are caused by, the discharge or leaking of oil into or onto marine waters." Cal. Gov't Code Section 8670.56.5(a).

132.    The Pacific Ocean and the waters off the Gaviota Coast are "marine waters" as defined in Section 8670.03(i).

133.    Defendants are "responsible part[ies]," which includes "the owner or transporter of oil or a person or entity accepting responsibility for the oil."

134.    The oil transported through Line 901 is "oil" within the meaning of the Act, which defines "oil" as "any kind of petroleum, liquid hydrocarbon, or petroleum products or any fraction or residues therefrom," including "crude oil."

135.    As the responsible party for the oil transported through Line 901, Defendants are absolutely liable under the Lempert-Keene-Seastrand Act.

136.    On May 19, 2015, Defendants discharged or leaked crude oil into the Pacific Ocean, and are therefore absolutely liable without regard to fault for all damages that Plaintiffs and the Class sustained or will sustain. That discharge was not permitted by state or federal law.

137.    The Act entitles a plaintiff to recover a wide variety of damages, including, but not limited to, loss of subsistence use of natural resources; loss of taxes, royalties, rents, or net profit shares caused by the injury, destruction, loss, or impairment of use of real property, personal property, or natural resources; and loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources. *See generally* Cal. Gov't Code Section 8670.56.5(h).

138.    The contamination illegally caused by the discharge of crude oil from Line 901 into or upon area beaches and the Pacific Ocean injured, caused to be lost, and/or impaired the use of property or natural resources on which Plaintiffs and the Class depend for their livelihood, including, but not limited to, local beaches and marine waters; populations of fish, and shellfish; and marine ecosystems.

139.    Because Plaintiffs rely on natural resources for subsistence use; Plaintiffs have ownership or leasehold interests in real or personal property damaged by Defendants' oil spill; Plaintiffs derive at least 25 percent of their

annual or seasonal earnings from activities that utilize property or natural resources
damaged by Defendants' oil spill; or Defendants' damage to real property,
personal property, and natural resources has caused Plaintiffs a loss of taxes,
royalties, rents, or net profit; or all of the above, Defendants are liable to Plaintiffs
and the Class under the Act.

140.    The injury, destruction, loss, and/or impairment of usability of these
natural resources has caused Plaintiffs and the Class to lose profits, and will cause
future losses of profits and/or impair their earning capacities.

141.    The long-lasting effects of contamination related to the discharge of
toxic crude oil into the Pacific Ocean on marine life, which Plaintiffs and the Class
rely on, requires that Plaintiffs and the Class continue future monitoring and testing
activities in order to ensure such marine life is not contaminated and is safe and fit
for human consumption.

## Second Claim for Relief
### Strict Liability for Ultrahazardous Activities

142.    Plaintiffs incorporate by reference each and every prior and
subsequent allegation of this Complaint as if fully restated here.

143.    At all times herein, Plains is the owner and operator of the oil pipeline
known as Line 901.

144.    At all times relevant to this action, Defendants had supervision,
custody, and control of Line 901.

145.    At all times herein, Defendants were under a continuing duty to
protect the Plaintiffs and the Class from the harm caused by Line 901.

146.    Defendants were engaged in an ultrahazardous activities by
transporting flammable, hazardous, and toxic oil through its pipeline.

147.    Plaintiffs and the Class have suffered harm from the discharge of
toxic oil from Defendants' Line 901.

148.   The injuries sustained by Plaintiffs as a result of the oil spill were the direct and proximate result of Defendants' activities.

149.   The harm to Plaintiffs and the Class was and is the kind of harm that would be reasonably anticipated as a result of the risks created by transporting flammable, hazardous, and toxic oil in a pipeline in close proximity to the Pacific Ocean.

150.   Defendants' operation of Line 901 and its failure was a substantial factor in causing the harms suffered by Plaintiffs and the Class.

151.   Due to Defendants' strict liability, Plaintiffs and Class members are entitled to recover actual damages.

152.   The acts and omissions of Defendants were conducted with malice, fraud, and/or oppression as set out in this Complaint.

## Third Claim for Relief
### Negligence

153.   Plaintiffs incorporate by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.

154.   Defendants owed a duty to Plaintiffs and the Class to exercise reasonable and ordinary care. That duty arose from, among other things, federal, state, and local laws that require Defendants to operate a pipeline in a manner that does not damage public health and safety.

155.   Defendants breached that duty to Plaintiffs and the Class by, among other things, failing to install reasonable safety equipment to prevent a spill, failing to detect and repair corrosion, and failing to promptly respond to and contain the spill.

156.   Defendants, in the exercise of reasonable care, should have known that Line 901 could rupture or otherwise fail, and spill significant amounts of oil.

Defendants have acknowledged that spills such as this have occurred on its pipelines in the past and will occur again.

157.    As a direct and proximate result of Defendants' negligence, Plaintiffs and the Class have sustained damages. Those damages take primarily two forms: short-term and long-term.

158.    The short-term damages include loss of profits due to fishing closures caused by the spill, and increased costs associated with traveling to different fisheries. The closures have excluded fishers from near shore fishing grounds for lobster, crab, shrimp, and other species. The short-term damages also include lost profits due to cancellations from tourists who, but for the spill, would have used services offered by businesses in Santa Barbara County, or simply visited Santa Barbara County and businesses there.

159.    The long-term damages include future lost profits due to the harm caused to the fisheries themselves. For example, the oil is likely to depress or even eradicate in some areas populations of sea urchins, crab, lobster, and other crustaceans by directly killing numbers of those species or hindering their breeding and feeding. Similarly, oil that sinks below the surface will poison fish and potentially smother their eggs, limiting their future numbers.

160.    Finally, the taboo associated with an oil spill has and will continue to drive down the price of local fish and shellfish, as consumers and fish processors become wary of producing locally-caught species.

161.    Similarly, the image of the Gaviota Coast as a pristine place and as a perfect place to vacation has been tarnished. Images of oil soaked birds, dead dolphins, and fouled beaches now show up prominently in internet searches for "Santa Barbara Beaches" and will dissuade people from visiting the region and the many businesses that depend on tourism and other visitors.

## Fourth Claim for Relief
### Violations of California's Unfair Competition Law Cal. Bus. & Prof. Code §§ 17200, *et seq.*

162.    Plaintiffs incorporate by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.

163.    Defendants have engaged in and continue to engage in unfair competition in violation of the Act.

164.    Defendants' conduct constitutes "fraudulent" business practices within the meaning of the Act in that members of the public have been harmed.

165.    Defendants' conduct amounts to "unfair" business practices as the Act forbids all wrongful business activities in any context in which they appear. Moreover, as described above, Defendants' practices offend established public policies, are immoral, unethical, oppressive, and unscrupulous. The impact of Defendants' practices is in no way mitigated by any justifications, reason, or motives. Defendants' conduct has no utility when compared to the harm done to Plaintiffs and members of the Class.

166.    Defendants' conduct is "unlawful" because it violated laws including but not limited to the Lempert-Keene Act, Government Code Section 8670, *et seq.*, the Porter-Cologne Act, Water Code Sections 13000, *et seq.*, and Cal. Fish & Game Code Section 5650, *et seq.*, *inter alia*, the Oil Pollution Act, local, state, and federal spill notification laws, and the oil spill response plans required by federal, state, and local laws. Federal, state, and local officials have announced civil and criminal investigations into Defendants' conduct related to the spill, so it is reasonable to infer that Defendants may have violated other laws.

167.    As a direct and proximate result of Defendants' unfair, fraudulent, and unlawful methods of competition and unfair and deceptive acts or practices, Plaintiffs and the Class have sustained damages.

168.   As a proximate result of Defendants' unfair methods of competition and unfair and deceptive acts or practices, Defendants have been unjustly enriched and should be required to make restitution payments to Plaintiffs and the Class pursuant to Bus. & Prof. Code §§ 17203 and 17204.

169.   The acts and omissions of Defendants were done with malice, fraud, and/or oppression as described in this Complaint.

### Fifth Claim for Relief
### Negligence Per Se

170.   Plaintiffs incorporate by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.

171.   At all times herein mentioned, Defendants negligently, wantonly, carelessly and/or recklessly maintained and operated Line 901.

172.   Defendants violated several statutes, ordinances, or regulations including but not limited to the Lempert-Keene Act, Government Code Section 8670, *et seq.*, the Porter-Cologne Act, Water Code Sections 13000, *et seq.*, Cal. Fish & Game Code Section 5650, *et seq.*, and state and federal spill response and notification laws.

173.   As a direct and legal cause of the Defendants' wrongful acts and omissions herein above set forth, Plaintiffs and the Class have suffered and will suffer economic harm, injury, and losses.

174.   Plaintiffs' harm resulted from the occurrence of the nature that the laws listed above were designed to prevent, and Plaintiffs are a member of the class of persons for whose protection those laws were adopted.

175.   The acts and omissions of Defendants, and each of them, were conducted with malice, fraud, and/or oppression as described in this Complaint.

## Sixth Claim for Relief
### Public Nuisance

176.    Plaintiffs incorporate by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.

177.    Defendants have created a condition that is harmful to health and interferes with the comfortable enjoyment of life and property by discharging approximately 101,000 gallons of crude oil onto the beaches of Santa Barbara County and into the Pacific Ocean.

178.    That nuisance affects a substantial number of individuals similarly situated to the Plaintiffs, such as residents and visitors to Santa Barbara County, commercial fishers, and businesses that rely on the safe and healthy environment in the county.

179.    The oil spill is a condition which would reasonably annoy and disturb an ordinary person, as shown by, for example, the health impacts warned of by the county, the community outrage in response to the spill, and the nationwide interest in the spill's impacts on the Gaviota Coast.

180.    The seriousness and gravity of that harm outweighs the social utility of Defendants' conduct. There is little or no social utility associated with releasing tens of thousands of gallons of oil into the unique ecological setting of Santa Barbara County.

181.    Plaintiffs and the Class suffered harm and injury to their economic livelihood, which they did not consent to and which is different from the type of harm suffered by the general public.

182.    The above acts and omissions also created a public nuisance *vis-a-vis* the Plaintiffs and the Class, interfering with the property rights of Plaintiffs and the Class, and rights incidental to those property rights.

183.   The acts and omissions of Defendants described herein were also in violation of various California state laws including but not limited to the Lempert-Keene Act, Government Code Section 8670, *et seq.*, the Porter-Cologne Act, Water Code Sections 13000, *et seq.*, and Cal. Fish & Game Code Section 5650, *et seq.*

184.   Defendants' violations of those statutes directly and proximately caused, and will cause, injury to the Plaintiffs and the Class of a type which the statutes are intended to prevent. Plaintiffs and the Class are of the class of persons for whose protection these statutes were enacted.

185.   As a direct and legal cause of Defendants' wrongful acts and/or omissions herein above set forth, Plaintiffs and the Class have suffered and will suffer economic harm, injury, and losses as herein above set forth.

186.   To remedy the harm caused by Defendants' nuisance, Plaintiffs will seek public injunctive relief, including, but not limited to, an order requiring Defendants to restore fisheries impacted by the spill and to repair reputational damage done to Santa Barbara's seafood industry.

187.   In maintaining the nuisance, which is ongoing, Defendants are acting with full knowledge of the consequences and damage being caused, and the acts and omissions of Defendants, were done with malice, fraud, and/or oppression as described in this Complaint.

<u>**Seventh Claim for Relief**</u>
**Negligent Interference With Prospective Economic Advantage**

188.   Plaintiffs incorporate by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.

189.   Plaintiffs and the Class have existing or prospective economic relationships with residents of Santa Barbara County, visitors to Santa Barbara

County, and other individuals and organizations doing business in and related to Santa Barbara County.

190.    These relationships have a reasonably probable likelihood of resulting in future economic benefits or advantages to Plaintiffs and the Class.

191.    Defendants knew or should have known of these existing and prospective economic relationships.

192.    Defendants owed a duty to Plaintiffs and the Class to avoid negligent or reckless conduct that would interfere with and adversely affect the existing and prospective economic relationships of Plaintiffs and the Class.

193.    Defendants breached that duty to Plaintiffs and the Class by, among other things, failing to install reasonable safety equipment to prevent such a spill, and failing to promptly respond to and contain the spill.

194.    Defendants knew or should have known that, if they failed to act with reasonable care, the existing and prospective economic relationships of Plaintiffs and the Class would be interfered with and disrupted.

195.    Defendants were negligent and failed to act with reasonable care as herein set forth above.

196.    Defendants engaged in wrongful acts and/or omissions as herein set forth above, including but not limited to their violations of federal, state, and local laws that require Defendants to operate its pipeline in a manner that does not damage public health and safety.

197.    As a direct and proximate result of Defendants wrongful acts and/or omissions, Defendants negligently and recklessly interfered with and disrupted the existing and prospective economic relationships of Plaintiffs and the Class.

198.    As a direct and proximate result of Defendants' wrongful acts and/or omissions, Plaintiffs and the Class have suffered and will suffer economic harm, injury, and losses as herein set forth above.

**Request for Relief**

Plaintiffs, individually and on behalf of all others similarly situated, request judgment against Defendants as follows:

A.    For an order certifying the Class and appointing Plaintiffs as representatives of the Class and appointing the lawyers and law firms representing Plaintiffs as counsel for the Class;

B.    Permanently enjoining Defendants from operating a pipeline in Santa Barbara County without adequate safety and response measures;

C.    For all recoverable compensatory, statutory, and other damages sustained by Plaintiffs and the Class, including disgorgement, unjust enrichment, and all other relief allowed under applicable law;

D.    Granting Plaintiffs and the Class awards of restitution and/or disgorgement of Defendants' profits from its unfair and unlawful practices described above;

E.    For costs;

F.    For both pre-judgment and post-judgment interest on any amounts awarded;

G.    For appropriate injunctive relief, including public injunctive relief; *i.e.*, an order requiring Defendants to restore fisheries impacted by the spill and to repair reputational damage done to Santa Barbara's seafood industry;

H.    For treble damages insofar as they are allowed by applicable laws;

I.    For appropriate individual relief as requested above;

J.    For payment of attorneys' fees and expert fees as may be allowable under applicable law, including the Private Attorneys General Act ("PAGA"), Cal. Code. Civ. P., § 1021.5;

K.    For exemplary or punitive damages under Cal. Civ. Code Section 3294 for the oppression, fraud, and malice alleged above; and

L.      For such other and further relief, including declaratory relief, as the Court may deem proper.

## IX.    DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues so triable.

RESPECTFULLY SUBMITTED this 1st day of July, 2015.

KELLER ROHRBACK L.L.P.

By /s/Matthew J. Preusch

Juli Farris (Bar No. 141716)
jfarris@kellerrohrback.com
Matthew J. Preusch (Bar No. 298144)
mpreusch@kellerrohrback.com
Keller Rohrback L.L.P.
1129 State Street, Suite 8
Santa Barbara, CA 93101
(805) 456-1496, Fax (805) 456-1497

Gretchen Freeman Cappio*
gcappio@kellerrohrback.com
Daniel Mensher*
dmensher@kellerrohrback.com
Keller Rohrback L.L.P.
1201 Third Ave, Suite 3200
Seattle, WA 98102-3-25
(206) 623-1900, Fax (206) 623-3384

Robert Lawrence Lieff (No. 037568)
rlieff@lchb.com
Robert Nelson (No. 132797)
rnelson@lchb.com
Elizabeth J. Cabraser (No. 83151)
ecabraser@lchb.com
Kristen Law Sagafi (No. 222249)
klaw@lchb.com
RoseMarie Maliekel (No. 276036)
rmaliekel@lchb.com
Lieff Cabraser Heimann & Bernstein, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111
(415) 956-1000, Fax (415) 956-1000

*Attorneys for Plaintiffs*
*\* Pro Hac Vice forthcoming*